In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 14-1034 & 14-1153

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWARD R. VELAZQUEZ,

*Defendant-Appellant.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:08-cr-00372-1 — **James B. Zagel**, *Judge.*

---

ARGUED OCTOBER 1, 2014 — DECIDED NOVEMBER 20, 2014

---

Before WOOD, *Chief Judge,* and RIPPLE and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. While we presume many criminal defendants are less than enthused about attending their own court proceedings, Edward R. Velazquez's aversion to the inside of a courtroom was extraordinary. Velazquez, who had been indicted on various charges related to a fraudulent investment scheme, violated his bond just prior to his scheduled trial date and remained a fugitive for six months.

Velazquez was eventually apprehended, and he then opted to plead guilty to a single count of mail fraud. Despite pleading guilty and thereafter being continuously in custody, Velazquez refused to be brought to court for seven consecutive hearings in the case. Finally, pursuant to a "drag order" by the district court, marshals forcibly brought Velazquez to court, and Velazquez sustained injuries in the process. The district court declined to enter another drag order, and Velazquez refused to appear for sentencing. The district court denied a motion to withdraw as counsel filed by Velazquez's retained lawyer and sentenced Velazquez *in absentia*.

Velazquez appeals, contending that the district court erred during the sentencing hearing by (1) denying counsel's motion to withdraw, (2) finding Velazquez to be voluntarily absent, and (3) failing to consider Velazquez's cooperation as a basis for a reduced sentence. We affirm.

## I.    Background

On May 8, 2008, a grand jury indicted Velazquez on charges of mail fraud, wire fraud, and transporting fraudulently obtained funds via interstate commerce. The indictment alleged that, in his role as president of V-Tek Capital, Inc., Velazquez devised and participated in a scheme to defraud investors by knowingly making materially false and fraudulent representations regarding V-Tek's "unique risk-averse" investment programs, which were "guaranteed" and "not subject to market risk" because a portion of the investment capital would be used to purchase United States Treasury "Zero-Coupon Bonds." The indictment alleged that Velazquez purchased no United States Treasury bonds, and instead misappropriated a substantial portion of investors' funds for his own personal use and benefit, and for the bene-

fit of his girlfriend. The indictment alleged that Velazquez's scheme resulted in investor losses of $1,600,000.

On May 12, 2008, Velazquez, who was represented by retained counsel, was arraigned and then released on an own-recognizance bond.

On October 21, 2008, Velazquez's first counsel filed a motion to withdraw, attaching as an exhibit a letter from Velazquez terminating his representation. The district court granted the motion on November 4, 2008. On November 10, 2008, a federal defender filed an appearance on behalf of Velazquez. On March 24, 2009, the district court scheduled Velazquez's jury trial to begin on November 16, 2009.

On November 5, 2009, Velazquez failed to report to pretrial services as required by the conditions of his bond. On November 16, 2009, the district court vacated the trial date. On December 9, 2009, after pretrial services reported that it was unable to contact Velazquez, the district court issued a bench warrant for Velazquez's arrest. Nearly six months later, on June 2, 2010, Velazquez was located and, after refusing to obey the commands of deputy marshals, was restrained and arrested through the use of force. The district court then ordered Velazquez to be detained pending trial.

On October 12, 2010, Velazquez's third attorney, James Marcus (a retained attorney), was granted leave to file his appearance in the case, and Velazquez's second counsel was allowed to withdraw.

On February 23, 2011, two weeks before the reset trial date, Velazquez entered into a written plea agreement whereby he agreed to plead guilty to a single count of mail fraud. In the agreement, Velazquez acknowledged the truth

of a detailed factual basis for his plea of guilty. The agreement contemplated that Velazquez would meet with the government in an attempt to provide substantial assistance in exchange for consideration at sentencing, and the agreement stated that the decision to move for a substantial-assistance reduction was within the sole discretion of the government.

On February 23, 2011, Velazquez engaged in a plea colloquy with the district court concerning his decision to enter into the plea agreement and plead guilty. While under oath, Velazquez said the following: he was satisfied with his attorney's advice and efforts on his behalf; the factual basis for the plea was true; no agreements or promises were made to him that were not contained in the plea agreement; and his decision to plead guilty was entirely voluntary. The district court accepted Velazquez's plea of guilty.

On February 3, 2012, the government reported to probation (for inclusion in the presentence investigation report) that Velazquez had met with the government on a number of occasions, but the government did not deem Velazquez to be a useful witness, and he had not provided substantial assistance to the government.

On May 31, 2012, defense counsel filed a motion to continue the sentencing date. The district court conducted a hearing on the motion on June 5, 2012. Attorney Marcus advised the district court that he was having difficulty communicating effectively with Velazquez. The district court vacated the sentencing date and set a status hearing for June 28, 2012, in order to learn whether Marcus was "able to solve the problem of communication."

On June 22, 2012, Marcus filed a motion to withdraw as counsel, citing "irreconcilable differences and defendant's refusal to speak and/or meet with [Marcus]." The district court conducted a hearing on the motion on June 28, 2012. Velazquez was not present for the hearing. Marcus stated that he prepared an order for Velazquez to be transported from the Metropolitan Correctional Center ("MCC") to court for the hearing. The judge said that it was "important … to know whether he decided not to come over himself or whether [the marshal] just didn't bring him over," so the judge reset the hearing on the motion to withdraw for July 24, 2012.

On July 24, 2012, Velazquez again did not appear in court. The judge received information from the marshal's service that Velazquez was on the prisoner production list but he refused to come to court. The judge remarked that Marcus was Velazquez's third counsel, and told Marcus: "I hate to impose this upon you, but I'm going to set this for another day … because I want to hear what [Velazquez] has to say." The court reset Marcus' motion to withdraw for August 21, 2012.

On August 20, 2012, Velazquez filed a *pro se* document entitled, "Notice of Special Appearance and Revocation of Plea Agreement and Written Allocution in Lieu of Sentencing." Velazquez asserted that his indictment was "invalid as a matter of law," and his plea agreement should be invalidated because Marcus and the prosecutor "acted in collusion in violation of [Velazquez]'s right to trial in order to minimize the amount of their investment of time in the case and to maximize their pay in relation to the amount of time they spent on the case."

On August 21, 2012, the district court conducted a hearing, but Velazquez again was not present. The judge remarked upon Velazquez's *pro se* filing and stated that "one of the major difficulties with this is for [Velazquez] to make his claim [to revoke his plea] he would actually have to come here and offer testimony and he's unwilling to come here." The judge stated that he wanted to inform Velazquez in person that "he may have waived the attorney-client privilege by filing these papers," and "it's a pretty grave thing to waive the privilege, particularly in a case [in] which a person has actually entered a plea of guilty and wishes to revoke it, and … some of this appeared to be very unwise for Mr. Velazquez to do, but he might have a good reason for it and we'll see." The district court invited the government to file a response to Velazquez's filing and scheduled another hearing in October.

On October 10, 2012, the district court conducted another status hearing, and again, Velazquez was not present. Marcus reported to the court that he had met with Velazquez several times in the previous six weeks, and Marcus requested that another status conference be set in December. The district court verified with Marcus that he and Velazquez were communicating and then reset the hearing for December 11, 2012.

On December 11, 2012, the district court conducted another status hearing, and again, Velazquez was not present. Marcus reported to the court that he met with Velazquez "as late as last night" and had "no idea" why Velazquez did not appear for the hearing. Marcus said that Velazquez was suffering from a cold and asked that the matter be continued until the end of January. Marcus said, "I think we're going in

the right direction and I think we're going to be able to resolve this hopefully at that time." The district court again continued the motion to withdraw as counsel and reset the hearing for January 31, 2013.

On January 31, 2013, the district court conducted another status hearing, and again, Velazquez was not present. Marcus said that he saw Velazquez the previous day, and he was "quite ill" with "an upper respiratory situation," and his absence was "somewhat legitimate … because of his situation." Marcus asked the court "for a long date" to "continue the motions" because "[t]here are some issues that have come up that I need to work through." Marcus stated that he thought he and Velazquez were "moving in the right direction." The district court again reset the hearing.

On June 24, 2013, the district court conducted another status hearing, and again, Velazquez was not present. Marcus reported that he had not spoken with Velazquez and he was "not sure" if Velazquez was willing to speak to him. The judge stated that "I think that we have to bring him to court [by force]," and Marcus responded that he thought that was appropriate. In the order following the hearing, the district court directed the marshal "to use reasonable force to bring Defendant" to the "[s]tatus/sentencing" on September 26, 2013 (the "drag order").

On September 25, 2013, a *pro se* filing from Velazquez dated August 7, 2013, was docketed with the district court. In that filing, Velazquez asserted that pursuant to various provisions of the Uniform Commercial Code, he did not "accept this offer to contract" or "consent to these proceedings," and therefore, the district court did not have jurisdiction over him.

On September 26, 2013, Velazquez was forcibly brought to court by deputy marshals pursuant to the district court's drag order. Marcus told the district court that Velazquez "was seriously injured today in being brought over here," and "[h]is ankle, elbow, and arm are seriously injured," and Velazquez "believes them to be broken." The judge said to Marcus, in Velazquez's presence, "I'm trying to find if there's some way that we can get him to court where he's willing to come, we don't have to drag him here, and he can speak his piece." The judge noted that "there are other problems that might exist that they come to his cell to bring him here and he struggles, perhaps hits one of the officers and that's another federal offense and just makes things much worse for him." The judge stated that Velazquez's filings "basically construing these court proceedings as somehow contractual … have never been accepted by the Courts of Appeal." The judge added: "[E]ven if I would happen to agree with him, which I don't, if I entered an order that was consistent with what he's giving me, the government will go to the Court of Appeals which will reverse me … . So, basically, the materials he's filing with me don't do him any good at all." The judge remarked that Velazquez's motion to withdraw his guilty plea is one of the "more traditional claims that we usually do deal with," but "if he doesn't come here we can't go forward with whatever claims he has and that's been my concern."

At the September 26, 2013 hearing, Marcus told the court that Velazquez "wants and will see me," and Marcus had received Velazquez's "assurances that he will see me at the MCC, which I plan on doing." Marcus stated that he wanted to address several issues with Velazquez, so Marcus can "prepare [an] appropriate response" to the presentence in-

vestigation report, and Marcus would "soon report to [the court] exactly how we're going to proceed going forward." At Marcus' invitation, the judge asked Velazquez, "Are you willing to talk with your lawyer about this?" Velazquez responded, "Yes, I am." The judge asked Velazquez whether he would come to court in the future without being compelled by the use of force, and Velazquez responded, "I believe so."

The district judge concluded the September 26, 2013 hearing by stating in Velazquez's presence that, if Velazquez continued to refuse to come to court, "he has forfeited his right to be present at the time I sentence him." The judge spoke of the "variety of reasons" why he did not want to again order the use of force to bring Velazquez to court, including "the risk of harm … both to the deputies and to Mr. Velazquez"; the "very large number of … marshals," who "have other more pressing duties to perform," but must be present in the courtroom when force is used on a defendant; and, the judge's observation that, "usually when I have to have somebody brought over by force, it makes the proceeding very difficult." The judge stated that he would have his courtroom deputy alert the MCC to the need to provide prompt medical care to Velazquez. The judge said the next court date would be set in November, for Velazquez to "come and participate and speak his piece."

Upon returning to the MCC, Velazquez decided that he could not wait until November to speak his piece. On October 2, 2013, October 10, 2013, November 1, 2013, and November 7, 2013, Velazquez filed *pro se* documents in which he repeatedly stated that the district court had no jurisdiction pursuant to the Uniform Commercial Code, and de-

clared that he would not participate in the proceedings. Velazquez asserted that he "will never accept or consent to [the district court's] alleged jurisdiction, to be judged, sentenced, or compelled to appear in alleged court via 'drag order.'"[1]

On November 19, 2013, the district court entered a minute order stating: "If Defendant fails to appear for the next status hearing set for 12/19/13, the Court will set a sentencing date. Defendant is advised that sentencing will proceed without him shall he fail to appear." It is clear Velazquez received a copy of this minute order, because, on December 17, 2013, Velazquez filed *pro se* more than 100 pages of documents, including a copy of the November 19, 2013 minute order with handwritten notes on it.

On December 18, 2013, the district court entered a minute order stating: "By agreement, the status/sentencing set for 12/19/13 is stricken and reset to 12/20/13 at 11:00 a.m." As discussed below, it is clear Velazquez received a copy of this minute order as well.

On December 20, 2013, government counsel and Marcus appeared in court, but Velazquez was absent. Nonetheless, Velazquez made his presence felt, much like the "man who wasn't there."[2] Velazquez had sent to the court a large vol-

---

[1] Although we would have thought this point to be self-evident, a defendant's consent pursuant to the Uniform Commercial Code, which governs certain areas of *commercial* law, does not determine a court's jurisdiction in *criminal* proceedings. Were it otherwise, the nation's prisons likely would be empty.

[2] "As I was going up the stair/I met a man who wasn't there." Hughes Mearns, Antigonish (1899), reprinted in Best Remembered Poems 107 (M. Gardner ed., 1992).

ume of documents similar to those which had been filed previously, relying upon the Uniform Commercial Code to declare that the court was without jurisdiction. The documents were placed on the docket later in the day on December 20, 2013, and included a copy of the district court's December 18, 2013 minute order rescheduling the "status/sentencing." The copy of the minute order contained handwritten notes, including the statement, "I do not accept this offer to contract and I do not consent to these proceedings," and was apparently signed by Velazquez. At the outset of the hearing, the district judge stated that one of Velazquez's documents referenced 28 U.S.C. § 2241 "for extraordinary relief from a criminal charge without jurisdiction," and the judge said, "to the extent that anything is filed as a motion, I'm denying it."

The district judge next stated that he had been informed that Velazquez "decided not to appear"; "[t]his was the day [the court] designated for sentencing even if he did not appear"; and, "in light of what happened last time," the judge "specifically directed … that he not be dragged here against his will." The judge called a deputy marshal to testify. The marshal testified that his office had been informed by MCC officials that Velazquez was refusing to come to court, and the marshal subsequently spoke to Velazquez, who told the marshal that "he talked to his lawyer yesterday and that it was his choice that he was not going to be present today."

Marcus remarked to the judge that he met with Velazquez "this week," and Marcus "anticipated his being here, quite frankly." The judge responded, "Well, he refused to come … . [As] a consequence of that … we are now going to proceed with sentencing." Then Marcus said, "I have a

motion to withdraw … . I just can't continue with represen-
tation under the circumstances. I'll get a public defender."
The judge responded that he was not granting Marcus leave
to withdraw. The judge noted that there was nothing con-
tained in the *pro se* documents filed by Velazquez which dis-
putes any of the statements in the presentence investigation
report. Marcus remarked that he and Velazquez "have had
discussions with respect to the PSR and there are certainly
factors that I would want to bring to the court's attention,"
but "[t]his is going to be very hard for me to continue with
this without the client." The judge responded: "That's a self-
imposed limitation on him and he imposes this limitation on
you." Marcus asked for additional time to file a response to
the presentence investigation report, and the court denied
the request because "[t]he opportunity to file something has
been available from the beginning. This was the sentencing
date. So you may choose to speak or not, as you wish."

The district court then proceeded to resolve issues raised
by Marcus relating to the calculation of the sentencing
guidelines range. Over the government's objection and con-
trary to the recommendation in the presentence investiga-
tion report, the court credited Velazquez with acceptance of
responsibility pursuant to § 3E1.1 of the guidelines. During
arguments on this point, Marcus told the judge that Ve-
lazquez "went through extensive meetings with the gov-
ernment … over several different occasions and over many
hours." The government confirmed that there were a num-
ber of proffers, but "[w]e did not feel he was a useful wit-
ness," and "[t]here were no new prosecutions brought as a
result." The judge noted that he had "looked at this before"
and "thought it was a close call on acceptance of responsibil-
ity." The judge decided to grant Velazquez acceptance of re-

sponsibility "in light of the fact that he attempted to cooperate."

Marcus also argued that Velazquez should not receive an upward adjustment for obstructing justice under § 3C1.1 of the guidelines, as recommended in the presentence investigation report. The government argued that the adjustment for obstruction was appropriate because Velazquez was "a fugitive for a period of time, he fought the attempt of law enforcement to arrest him when they did locate him," and "we had a trial date set before his flight." The court agreed with the government and found obstruction because Velazquez caused "a real delay of the process … of justice."

At that point in the proceedings, Marcus asked for a brief recess and then informed the court that Velazquez's common-law wife had just entered the courtroom. Marcus told the court that she had filed a complaint against him with the Illinois Attorney Registration and Disciplinary Commission. Marcus said, "I neglected to bring that to the court's attention, which does create somewhat of a conflict of interest for me and would certainly be … part of my basis to withdraw from the case, too." The judge responded: "Well, I think it stops you from saying anything else, but you said all you can say."

The court next heard comments from Velazquez's common-law wife and Velazquez's sister regarding Velazquez's positive personal characteristics. Marcus next argued that Velazquez's "extensive" attempts at cooperation "warrants some consideration … in crafting a sentence," and asked for a 60-month sentence. Government counsel then spoke, focusing on the harm to the victims, and arguing that "the manner in which Mr. Velazquez has chosen to comport

[himself] in these proceedings really [does not] bode well for rehabilitation and probably suggests recidivism is a real concern."

The district court then discussed the nature of the offense and the history and characteristics of Velazquez. The court remarked upon the statements of Velazquez's family members and said that while Velazquez may have been "a good person to have for a family member," the "duty of a citizen extends a little longer." The court stated that Velazquez "was a con man and he hurt a lot of people." The court said that "post-charge conduct [was] particularly important," focusing specifically on Velazquez's decision to violate his bond, which "shows that he does not truly understand the damage he's done," and "proved … that he can't keep his word." The court stated that the guideline range was 121 to 151 months' imprisonment and then sentenced Velazquez to 136 months, which was "in the dead middle of that guideline" and was an "appropriate sentence" in this case. The court also imposed three years of supervised release and restitution of $5,532,714. Judgment was subsequently entered, and this appeal followed.

## II.     Motion to Withdraw

On appeal, Velazquez first contends that the district court committed reversible error when it denied Marcus' motion to withdraw as counsel. Velazquez contends that the denial of the motion to withdraw constituted an arbitrary denial of Velazquez's Sixth Amendment right to be represented by retained counsel of Velazquez's choice, which was a structural error justifying reversal without inquiry into prejudice, as described in *United States v. Sellers*, 645 F.3d 830 (7th Cir. 2011). The government contends that the structural-

error analysis of *Sellers* only applies when a court arbitrarily or unreasonably denies a defendant the right to be represented by *retained* counsel of choice, and is inapplicable in this case because Velazquez never identified a retained attorney to replace Marcus, and Marcus told the district court that Velazquez would need a public defender. The government contends that the proper analysis consists of reviewing the district court's decision for an abuse of discretion, and even if an abuse of discretion is found, to "nevertheless uphold the district court's decision unless the defendant establishes that he was deprived of his Sixth Amendment right to effective assistance of counsel." *United States v. Volpentesta*, 727 F.3d 666, 673 (7th Cir. 2013) (citing *United States v. Zillges*, 978 F.2d 369, 372–73 (7th Cir. 1992)). The government contends that the district court did not abuse its discretion, and, in any event, Velazquez has not shown—or even attempted to show—that "the performance of his attorney was not within the range of competence demanded of attorneys in criminal cases, and that but for counsel's deficiencies, the result of the proceeding would have been different." *Zillges*, 978 F.2d at 372–73 (citation and internal quotation marks omitted).

We do not need to decide which analysis applies to this unusual set of facts because, even if we apply Velazquez's preferred analysis enunciated in *Sellers*, we find no error. The Sixth Amendment right to counsel includes "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). "Consequently, a court cannot arbitrarily or unreasonably deny a defendant the right to retain chosen counsel." *Sellers*, 645 F.3d at 834. A denial of the right to counsel of choice constitutes structural error, and a

defendant claiming a denial of this right does not have to show prejudice. *See Gonzalez-Lopez*, 548 U.S. at 148–50.

"The right to counsel and the right to engage counsel of one's choosing, however, are not absolute. A court retains wide latitude to balance the right to choice of counsel against the needs of fairness to the litigants and against the demands of its calendar." *Sellers*, 645 F.3d at 834; *see also United States v. Carrera*, 259 F.3d 818, 824–25 (7th Cir. 2001) ("Although a person has the right to be represented by the counsel of his choice, this right is not absolute, but qualified, and must be balanced against the requirements of the fair and proper administration of justice.") (internal quotation marks omitted). For example, trial courts have broad discretion to grant or deny a request for a continuance to substitute new counsel, and "'[o]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay' violates the Sixth Amendment right." *Sellers*, 645 F.3d at 834 (quoting *Carrera*, 259 F.3d at 825). "In determining whether the decision was arbitrary, we consider both the circumstances of the ruling and the reasons given by the judge." *Id*. at 834–35.

Generally, when reviewing the denial of a motion to substitute counsel, we consider "the adequacy of the [district] court's inquiry into the defendant's motion." *Zillges*, 978 F.2d at 372; *see also Sellers*, 645 F.3d at 837–38; *Carrera*, 259 F.3d at 825. "Unless the complaint underlying a request for substitution of counsel is sufficiently detailed, the court may not rule on the motion without conducting a proper hearing at which both attorney and client testify as to the nature of their conflict." *Zillges*, 978 F.2d at 372 (internal quotation marks omitted). Here, Marcus' motion to withdraw cited "ir-

reconcilable differences and defendant's refusal to speak and/or meet with [Marcus]." The district court set multiple hearings on the motion, but the court declined to rule on the motion without Velazquez being present, because the court wanted to "hear what [Velazquez] has to say." The next time Velazquez appeared before the district court, on September 26, 2013, it appeared from both Marcus' and Velazquez's statements that any breakdown in the attorney-client relationship had been repaired. We do not find that the district court acted arbitrarily or unreasonably in relation to the motion to withdraw prior to or during the September 26, 2013 hearing.

What remains to consider is the next and final hearing, the December 20, 2013 sentencing. Once it became clear that the district court would proceed with sentencing, Marcus raised the issue of the pending motion to withdraw. Marcus did not name substitute counsel, instead stating, "I'll get a public defender." Marcus did not indicate that Velazquez refused to communicate with Marcus, which was the only specific reason given in the written motion on June 22, 2012; indeed, Marcus told the court at sentencing that he had been meeting with Velazquez—including a meeting on the day prior to sentencing—and they had discussed the presentence investigation report. The only reason Marcus gave for raising the motion to withdraw at the outset of the sentencing hearing was that it "is going to be very hard for me to continue with this without the client." We cannot say that the district court acted unreasonably or arbitrarily in finding

"[t]hat's a self-imposed limitation on [Velazquez] and he imposes this limitation on [Marcus]."[3]

Midway through the sentencing hearing, Marcus raised an additional ground for moving to withdraw—the state bar complaint filed against Marcus by Velazquez's wife. Under other circumstances, we might find that a district court is obliged to inquire further into such a complaint, but under the circumstances of this case, we find no error. Marcus made clear that the complaint had not been filed by Velazquez, and given how late in the proceedings the matter was raised, it was not unreasonable or arbitrary for the district court to continue with sentencing. *Cf. Carrera*, 259 F.3d at 825 ("The untimely nature of Luis's motion coupled with its close proximity to trial as well as the fact that Luis was unable to name his new counsel made it reasonable for the district court to question whether Luis's motion was an attempt to delay the trial.").

In short, "[t]he right to counsel of one's choice does not give [a defendant] the power to manipulate his choice of counsel to delay the orderly progress of his case." *Id*. (internal quotation marks omitted). Given the unique facts of this case, we do not find that the district court erred in denying Marcus' motion to withdraw.

### III.    Voluntary Absence

Velazquez contends that the district court committed clear error when it found him to be voluntarily absent and

---

[3] As discussed *infra*, we find no error in the district court's determination that Velazquez was voluntarily absent during sentencing. If the reverse had been true, our analysis related to the denial of the motion to withdraw might be different.

sentenced him *in absentia*. Velazquez argues that in *United States v. Achbani*, 507 F.3d 598 (7th Cir. 2007), we established a bright-line rule that a defendant in custody may never be deemed voluntarily absent during sentencing.

Federal Rule of Criminal Procedure 43 guarantees a defendant the right to be present at both trial and sentencing. However, Rule 43 also provides that a defendant in a non-capital case waives the right to be present at his sentencing when he is "voluntarily absent." Fed. R. Crim. P. 43(c)(1)(B). We review for clear error a district court's finding of voluntary absence. *Achbani*, 507 F.3d at 601. "The district court should indulge every reasonable inference against a finding of voluntary absence. Before proceeding, the district court must explore on the record any serious questions raised about whether the defendant's absence was knowing and voluntary." *Id*. at 601–02 (citation and internal quotation marks omitted). "[H]owever, the district court's duty to explore such possibilities varies to the extent that defense counsel suggests circumstances that raise a *plausible* doubt that the defendant's absence was voluntary." *Id*. at 602.

*Achbani* states, as an "example", that "a defendant taken into legal custody is not voluntarily absent." *Id*. (citing *Larson v. Tansy*, 911 F.2d 392, 397 (10th Cir. 1990)). This statement is dictum because the custody of the defendant was not an issue in *Achbani*. The case cited in *Achbani* to support the dictum, *Larson*, states: "We recognize that there may be times when a defendant in custody could waive his right to be present." *Larson*, 911 F.2d at 397. At least two other circuits have affirmed a district court finding that a defendant in custody was voluntarily absent pursuant to Rule 43 when

he or she chose to remain in a cell rather than attend trial.[4] *See United States v. Bradford*, 237 F.3d 1306, 1311–12 (11th Cir. 2001); *United States v. Nichols*, 56 F.3d 403, 416 (2d Cir. 1995). In this case, when the district court entered a drag order to force Velazquez's attendance, Velazquez was, in the words of his attorney, "seriously injured." Given the risk of injury to an obstreperous defendant, as well as to the guards forcibly moving him, this case illustrates the inadvisability of a bright-line rule that a defendant in custody can never be voluntarily absent. We think the better rule is that voluntary absence under Rule 43 should be decided on a case-by-case basis, and, as indicated in *Larson*, there may be times when a defendant in custody waives his right to be present. *See Larson*, 911 F.2d at 397; *see also Nichols*, 56 F.3d at 416 ("The fact that [defendant] was in custody does not itself preclude a voluntary waiver.").

After examining the facts of this case, we find that the district court did not clearly err in finding that this is one of those—perhaps rare—times when a defendant in custody has knowingly and voluntarily waived his right to be present during sentencing. By the date of sentencing, Velazquez had a long-standing and well-documented aversion to appearing voluntarily in court, and it was apparent that Velazquez's absence had not made his heart grow fonder toward the district court. Velazquez's *pro se* filings in the weeks leading up to sentencing asserted that he would "never" consent to the proceedings, nor consent to be

---

[4] We employ the same standard for determining whether a defendant is voluntarily absent during sentencing and during trial. *See Achbani*, 507 F.3d at 601.

"judged, sentenced, or compelled to appear in alleged court via 'drag order.'"

Velazquez was adequately informed prior to the date of sentencing that if he failed to appear, sentencing would nonetheless occur: the district judge informed Velazquez in person at the September 26, 2013 hearing that he would "forfeit[] his right to be present" at sentencing if he refused to appear; the November 19, 2013 minute order "advised" Velazquez "that sentencing will proceed without him shall he fail to appear"; and the December 18, 2013 minute order, which reset the "status/sentencing" to December 20, 2013, was returned to the court on the morning of December 20, 2013 with what appears to be Velazquez's hand-writing on it. Moreover, on the morning of sentencing, Velazquez told staff at the MCC that he was refusing to appear, and he later repeated his refusal to a deputy marshal.

On appeal, Velazquez contends that the district court erred in finding him to be voluntarily absent in the face of Marcus' statement at sentencing that Marcus "anticipated [Velazquez] being here, quite frankly." However, in light of Marcus' less-than-stellar history of predicting Velazquez's presence, in conjunction with the facts identified above, we find no "circumstances that raise a *plausible* doubt that the defendant's absence was voluntary." *Achbani*, 507 F.3d at 602. The district court did not clearly err in finding that Velazquez was voluntarily absent during sentencing.

At oral argument, Velazquez's appointed counsel suggested that the district court might have allowed Velazquez to participate in or at least view the sentencing from the MCC via video-conferencing. The possibility of video-conferencing was not raised before the district court by any

party. While perhaps it would be advisable in the future for district judges facing similar intransigent behavior to investigate the possibility of video-conferencing, we cannot say that the district judge clearly erred in failing to consider it in this case.

## IV.   Cooperation

Velazquez's final argument is that the district court committed a procedural error by failing to consider Velazquez's proffers of cooperation in the context of the factors set forth in 18 U.S.C. § 3553(a).

We review *de novo* whether a district court followed proper procedures in sentencing, including its consideration of the § 3553(a) factors. *United States v. Trujillo-Castillon*, 692 F.3d 575, 578 (7th Cir. 2012). When considering the § 3553(a) factors, the district court must address all of a defendant's principal arguments that are "not so weak as to not merit discussion." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). The judge, however, "need not spend time addressing an argument if 'anyone acquainted with the facts would have known without being told why the judge had not accepted the argument.'" *United States v. Castaldi*, 743 F.3d 589, 595 (7th Cir. 2014) (quoting *Cunningham*, 429 F.3d at 679). "The amount of explanation needed in any particular case depends on the circumstances, and less explanation is typically needed when a district court sentences within an advisory guidelines range." *United States v. Curby*, 595 F.3d 794, 797 (7th Cir. 2010) (citation and internal quotation marks omitted).

"A district court may consider a defendant's cooperation with the government as a basis for a reduced sentence [pur-

suant to § 3553(a)], even if the government has not made a § 5K1.1 or Rule 35 motion." *United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cir. 2011); *see also United States v. Patrick*, 707 F.3d 815, 820 (7th Cir. 2013) ("Patrick's argument based on his cooperation is a ground of recognized legal merit for a reduced sentence.") (internal quotation marks omitted). In *Castaldi*, we rejected a defendant's argument that the district court's sentencing explanation failed to show meaningful consideration of defendant's cooperation, even though the court did not specifically address the defendant's coopera-tion in relation to the § 3553(a) factors. *See* 743 F.3d at 594–97. We found that, "[p]aying close attention to the context and practical realities here, … we see that the judge was well aware of the disclosure and cooperation." *Id*. at 595–96.

During the sentencing hearing, the district court heard Marcus' argument regarding Velazquez's cooperation, and then asked the government about it. Upon hearing the gov-ernment's assessment that Velazquez was not a "useful wit-ness," the judge noted that he had "looked at" the coopera-tion issue when he first read the presentence investigation report. The judge stated that "it was a close call," but "in light of the fact that he attempted to cooperate," the judge granted Velazquez a downward adjustment for acceptance of responsibility in calculating the guidelines range. The judge then made an upward adjustment for obstruction of justice, indicating that the judge did not find Velazquez's post-charge conduct to be entirely positive. The judge's later comments made it clear that, overall, the court viewed Ve-lazquez's post-charge conduct to be an aggravating, rather than a mitigating, factor. The judge emphasized that Ve-lazquez's "conduct on bond" shows "that he does not truly understand the damage he's done" and "proved … that he

can't keep his word." The judge found this "post-charge conduct" to be "particularly important, because at that point in time there can't be any doubt in [Velazquez's] mind that he's clearly going down the wrong path." The court then imposed a sentence in the middle of the guidelines range.

We find that, in this case, the district judge did not need to "belabor the obvious or be explicit where anyone acquainted with the facts would have known without being told why the judge did not accept the argument." *Castaldi*, 743 F.3d at 597 (citing *United States v. Gary*, 613 F.3d 706, 709 (7th Cir. 2010)). The district judge's discussion of "the people who suffered because of what [Velazquez] did" and Velazquez's "quite bad[]" post-charge conduct, clearly indicate that those factors dominated the judge's thinking. And his earlier statement that it was a "close call" on whether Velazquez's cooperation merited a downward adjustment of the guidelines shows that the judge was not particularly impressed by Velazquez's attempts at cooperation. *Cf. id.* at 596 ("The judge's explanation emphasized so strongly the harm to the victims that we know that factor dominated his thinking. And his questions to defense counsel at the beginning and end of the hearing show that he understood but was not moved by Castaldi's decision to come forward and confess after more than twenty years of fraud."). The district judge's "thinking on this point was so obvious that we need not remand for him to make that point explicit in a second hearing," *id.*, particularly in light of the within-guidelines sentence. *See Curby*, 595 F.3d at 797. We find no procedural error in the district court's consideration of the § 3553(a) factors.

### V.  **Conclusion**

For the foregoing reasons, we AFFIRM the judgment of the district court.